**GINN IOWA OIL COMPANY and William F. Ginn, Plaintiffs,**

v.

**The IOWA DEPARTMENT OF TRANS-PORTATION, Van Snyder and Raymond Kassel, Defendants.**

Civ. No. 79–32–W.

United States District Court, S. D. Iowa, W. D.

Oct. 31, 1980.

Raymond E. Pogge, Council Bluffs, Iowa, for Ginn Iowa Oil Company and William F. Ginn, plaintiffs.

Richard E. Mull, Ames, Iowa, for defendants, Iowa Dept. of Transp. and others.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

O'BRIEN, District Judge.

### I. INTRODUCTION

Trial of the above-captioned matter commenced on August 11, 1980.

Plaintiffs allege a cause of action against the defendants based upon a theory of deprivation of property without due process of law in violation of the Fourteenth Amendment of the United States Constitution and Article I of the Constitution of the State of Iowa. Defendants deny all of plaintiffs' claims and plead certain affirmative defenses.

Subsequent to the conclusion of the trial the parties filed proposed findings of fact and conclusions of law. After fully considering this entire matter, the Court finds that plaintiffs have failed to sustain their burden in proving that defendants have deprived plaintiffs of property without due process of law.

## II. STIPULATED FACTS AND ALLEGATIONS

This case involves the construction of a highway median on Highway # 165 in front of plaintiffs' place of business—a service station. The Defendant Iowa Department of Transportation intends to construct the median without a two-lane opening for plaintiffs' service station. Plaintiffs feel this amounts to a taking without due process of law.

The following facts are undisputed:

1. The Plaintiff Ginn Iowa Oil Company is a Nebraska corporation and William F. Ginn is a resident of the State of Nebraska; the Iowa Department of Transportation has its headquarters in Ames, Iowa and is an agency of the State of Iowa; Van Snyder is a resident of the State of Iowa and is district engineer for Southwestern Iowa for the Iowa Department of Transportation and Raymond Kassel is Director of the Iowa Department of Transportation at Ames, Iowa.

2. The plaintiffs are the owners of certain real estate located and described as part of the Southwest ¼ of Section 21, Township 75 North, Range 44 West of the 5th P.M. in the City of Carter Lake, Pottawattamie County, Iowa, which property abuts upon Iowa Highway # 165 known as Abbott Drive. The property of the plaintiffs is zoned commercial, which is the highest and best use of the property. Abbott Drive is a prime arterial route which connects Eppley Airfield in Nebraska, and Omaha, Nebraska and surrounding communities, and said Abbott Drive passes through Carter Lake, Iowa on the way to Eppley Airfield. Abbott Drive commences at 9th Street and Capitol Avenue in Omaha, proceeds northerly past Eppley Airfield to Carter Boulevard and is approximately 3.6 miles in length.

3. Plaintiffs' station abuts Abbott Drive where it is a concrete paved two-lane highway without a median. Abbott Drive is a two-lane highway from the Omaha central business district north to the Central Gulf Railroad right of way adjacent to plaintiffs' station. Abbott Drive is a concrete paved four-lane median-divided highway north of this point.

4. Abbott Drive serves the Eppley Airfield and the industrial development west and northwest of the airport. The service area of Eppley Airfield consists of the Standard Metropolitan Statistical Area of Omaha and Council Bluffs. The population of this area has increased as follows:

| | Standard Metropolitan Statistical Area | City of Omaha | City of Council Bluffs |
|---|---|---|---|
| 1979 | 598,120 | 385,950 | 66,385 |
| 1975 | 574,000 | 376,800 | 64,850 |
| 1970 | 542,646 | 354,389 | 60,348 |
| 1965 | 512,000 | 323,300 | 57,950 |
| 1960 | 457,873 | 301,598 | 55,641 |

Source: All figures are for April 1 of the respective year. 1960 and 1970 are Bureau of the Census figures; 1971–1979 are economic developmental council estimates.

5. The industrial and commercial development along Abbott Drive includes the Omaha City Dock facilities, Kanappen Molasses, Cargill, Omaha Fire Department Training Academy Building, Omaha Solid Waste Recycling Center, Aaron Ferren Iron Company, Williams Brothers Pipe Line Company, and Paxton-Vierling Steel Company. Along Abbott Drive, there is considerable vacant land available for commercial and industrial development.

6. A traffic count conducted by the City of Omaha in 1975 indicates an average daily traffic (ADT) of 13,256 at the intersection of Abbott Drive and Avenue "H". Traffic volumes ranged from 652 to 1106 vehicles per hour. Defendants' Exhibit 5. The *1995 Forecasted Traffic Flow* prepared by the Omaha-Council Bluffs Metropolitan Area Planning Agency projects that the ADT for Abbott Drive will increase to approximately 18,000 from 6th Street to Ave-

nue "G", and approximately 22,300 ADT from 9th and Capitol to 6th Street in the year 1995. Defendants' Exhibit 6; Defendants' Exhibit 4, p. 2–2.

7. Abbott Drive is being improved as a four-lane controlled access facility pursuant to project agreements entered into between the Iowa State Highway Commission, now the Iowa Department of Transportation, and the City of Carter Lake on January 31, 1973; Iowa State Highway Commission, now the Iowa Department of Transportation and the City of Omaha, entered into on February 22, 1973; and the Iowa Department of Transportation and the Nebraska Department of Roads entered into on March 21, 1978.

8. The portion of Abbott Drive being improved crosses through Nebraska and Iowa, commencing at the intersections of 8th Street and Capitol Avenue and 10th Street and Capitol Avenue in Omaha, Nebraska, on the south and extending north to the Nebraska-Iowa line at Avenue "G". Said project agreements provide that the City of Omaha and the Nebraska Department of Roads will be responsible for the planning, design and construction of the project, all plans and specifications to be approved by the Iowa Department of Transportation; that the City of Omaha and the Nebraska Department of Roads will be reimbursed by the Iowa Department of Transportation for the costs of said improvement for that portion of said Abbott Drive within the State of Iowa.

9. The preliminary plans for said improvement provided for a median cut, allowing left turns from said Abbott Drive, for northbound vehicles, onto the property of the plaintiffs, and allowing left turns from the plaintiffs' property onto Abbott Drive for vehicles to proceed north. The final plans for said improvement have eliminated the median cut which will result in a barrier for left turns from Abbott Drive onto the property of the plaintiffs and from the property of the plaintiffs onto the northbound lanes of Abbott Drive. The construction project plans provide the construction of a four-lane median-divided highway similar to the completed four-lane portion of Abbott Drive. The project has an approximate length of 1.019 miles (0.558 miles in Nebraska, and 0.461 miles in Iowa). The present plans provide for the construction of a 16-foot-long raised median dividing the north and south lanes of traffic on Abbott Drive, which would prohibit traffic from crossing said median. The cost of the construction project is $2,522,283.95.

10. The Iowa Department of Transportation condemned the access rights to certain property owned by the plaintiffs adjacent to and south of the presently located filling station. No real estate was condemned. The awards by the condemnation jury for said access rights are being appealed by the plaintiffs in the Iowa District Court of Pottawattamie County at Council Bluffs, Iowa. Access to the plaintiff's service station to southbound traffic has been reserved at the two present entrances.

11. The project plans provide for two median openings on Abbott Drive, one approximately 700 feet south of the plaintiffs' property, and the other about one-half mile further south. These proposed median openings connect with frontage road connections serving more than one parcel of property. In addition there is a median cut approximately 1000 feet north of the plaintiff's property at "H" Street.

### III. FINDINGS OF FACT

1. The Court adopts the preceding stipulated facts as its own.

2. Plaintiffs' principal place of business was in Nebraska.

3. The proposed median, with no median cut, will reduce access to, and therefore revenues to, plaintiffs' business.

4. Defendants did not act unreasonably or arbitrarily in placing a median, with no median cut, in front of plaintiffs' place of business.

### IV. CONCLUSIONS OF LAW

A. *Jurisdiction*

The Court concludes that 28 U.S.C. § 1332 confers jurisdiction on this Court because

both the statutory minimum amount has been alleged and there is diversity of citizenship of the parties.

Defendants did not dispute the jurisdictional amount but did challenge plaintiffs' claim of diversity.

First, defendants allege that plaintiffs' principal place of business is Iowa, rather than Nebraska, and since the suit is against Iowa residents and an Iowa agency, there is no diversity.

■ It is clear that plaintiff has the burden of proof when, as here, diversity is challenged. *Village Fair Shopping Center v. Sun Broadhead Trust*, 588 F.2d 431, 433 (5th Cir. 1979). To carry this burden, William Ginn, the plaintiff, testified that he has two gas stations in Iowa and one in Nebraska but that the station in Nebraska would be worth "twice as much as the two stations in Iowa." He further testified that he has invested a total of $60,000 in the Iowa stations and $90,000 in the Nebraska station and that there is a total of six employees at the Iowa stations and six at the Nebraska station. The testimony also indicated that the company is incorporated in Nebraska and has offices there. None of this testimony was refuted by defendants and no additional testimony was presented by defendants.

■ The question of the determination of a corporation's principal place of business is a question of fact. *Village Fair*, 588 F.2d at 433. The Court concludes that plaintiffs have carried their burden of showing that the plaintiffs' principal place of business was Nebraska.

■ Defendants' second contention with respect to jurisdiction is that the Nebraska highway officials were indispensable parties to this action and, as such, their presence would destroy diversity jurisdiction.

The Court concludes that the Nebraska highway officials were not necessary or indispensable parties to this suit. It is undisputed that the land here in question was located in Iowa and that the disputed median is located in Iowa. It is true, as defendants allege, that the construction of this highway was a joint effort of the Iowa and Nebraska highway divisions. An agreement to that effect was entered into evidence (Defendants' Exh. 11). The following language is found in that agreement:

Now therefore in consideration of these premises and the mutual covenants hereinafter set forth, it is hereby agreed as follows:

.        .        .        .        .

2. That all plans and specifications will be approved by Iowa and Nebraska before any construction contracts are awarded in accordance therewith.

3. That Iowa will bear all costs of work performed in Iowa, computed on the basis of actual quantities and bid prices, plus its proportionate share of costs which cannot be definitely assigned to either State, based on the cost of the other items.

4. Each party hereto will acquire at its own cost all necessary right of way for the improvement lying wholly within the borders of its own State.

Also, the agreement between the City of Omaha, Nebraska and Iowa State Highway Commission (Defendants' Exh. 10) states:

3. The City of Omaha will accomplish all right-of-way layout, title search and appraisal for the Iowa portion of the Abbott Drive project. All proposals and contracts for the appraisal services will be submitted to the Iowa State Highway Commission for approval prior to the start of appraisal work.

The Iowa State Highway Commission will promptly reimburse the City of Omaha for right-of-way appraisal costs on the Iowa section upon completion of the work and proper billing.

These clauses show that all plans affecting Iowa had to be approved by the Iowa Department of Transportation. Without such approval, the work could not go forward. Further, all costs incurred in Iowa were to be paid by Iowa. It is clear from these provisions that the State of Nebraska

had no direct interest in any action affecting a portion of the highway located in Iowa. If challenge had been made to the entire Iowa-Nebraska agreement or if, for some reason, an attempt was made to eliminate the project in Iowa, then Nebraska might be considered indispensable. The facts before the Court, however, concern only one small portion of the highway in Iowa. Using the four-factor test of *Doty v. St. Mary Parish Land Company*, 598 F.2d 885, 886–87 (5th Cir. 1979), the Court concludes that the Nebraska officials were not indispensable parties under Fed.R.Civ.P. 19. This Court, therefore, was not without jurisdiction.

### B. *The Median Cut*

Defendants contend that the median cut was eliminated for three reasons:

1) safety
2) traffic flow
3) uniformity

■ In Iowa, regulation of controlled-access highways is regulated by § 306A, Code of Iowa (1979). It is clear from this chapter that the police power of the State encompasses the action of the State in this case. *Id.* at § 306A.3; *A and S, Inc. v. Iowa State Highway Comm'n*, 253 Iowa 1377, 116 N.W.2d 496, 501, 503 (1962). Plaintiffs do not take a contrary position. However, plaintiffs state that the Department of Transportation has acted arbitrarily and unreasonably.

■ The Court may interfere with the exercise of the Department of Transportation's use of the police power only if there has been an abuse or an attempt to act beyond that grant of power. *A and S Inc.*, 116 N.W.2d at 501, 503. If the actions taken by the defendants tend to support one of the three reasons stated above, there has been no abuse of discretion.

The issue before the Court, then, is narrow: Have the plaintiffs sustained their burden of proof in showing that the plans of the Department of Transportation, to place a solid median in front of plaintiffs' business, run counter to the common experience of mankind to such extent as to be unreasonable? The Court must answer no.

Defendants presented witnesses that testified to the following:

1) that preliminary plans are subject to change [1]

2) that there is a need for a controlled-access highway at the disputed location [2]

3) that median strips are placed on high volume, high speed lanes and that such is the condition at the disputed location [3]

■ Plaintiffs presented no evidence to dispute this testimony but, rather, argued that the presence of a median strip without a cut would not increase safety and would actually decrease the safety of the highway. Plaintiffs' support for this contention was found in the testimony of William Ginn, who stated that he believed that people would attempt to jump the median or make illegal turns to get to his service station. Kevee Kirshenbaum also testified that if the station went out of business, drivers who ran out of gas would leave their cars on the roadside, thus causing a hazard.

Defendants' evidence on the safety of the proposed median was found in the testimony of George Sisson, who said that a median provides less of a chance for collisions and was, therefore, safer. Also, upon cross-examination, Wilbert Beran testified that a barrier median minimizes head-on collisions. He stated that this makes travel safer and increases traffic flow and capacity. He further testified that the proposed design was reasonable for accomplishing these purposes.

---

1. Testimony of Wilbert J. Beran, George Sisson, Joe Berenis, Jess Truby and Roy Hogrefe.

2. Testimony of Joe Berenis and Jess Truby.

3. Testimony of Jess Truby.

The Iowa Supreme Court has had several opportunities to address the issue presented to this Court. In *Iowa State Highway Commission v. Smith*, 248 Iowa 869, 82 N.W.2d 755 (1957), the Court was presented with a factual situation similar to that of the case at bar. There, the Highway Commission limited access to a filling station with a connected garage and cafe by: 1) limiting access to the highway to two driveways and 2) regulating against the crossing of the highway and the making of left turns and U-turns. The highway had been designated a controlled-access highway by the Commission. The limitations were upheld as a valid exercise of the police power. The Court stated:

> We have no difficulty in disposing of defendants' appeal from the part of the judgment holding the prohibition of crossing the highway, left turns and U turns except at designated points where there are no raised "jiggle" bars does not constitute a taking of defendants' property within the law of eminent domain. The law on this phase of the controversy seems to be thoroughly settled by many recent decisions and the judgment must be affirmed on defendants' appeal. We shall not discuss the matter at length nor attempt to cite more than a few of the authorities that support our conclusion.

> Such regulations as are imposed here on the movement of traffic are almost universally regarded as reasonable. They facilitate more travel by more motorists in less time. They eliminate left turns and U turns, restrict the number of places where motorists may enter and leave the highway and practically eliminate collisions between vehicles going in opposite directions. Thus they greatly reduce sources of danger.

> Insofar as the regulations may divert some traffic (mainly east bound) from defendants' filling station they have no legal cause for complaint. They have no vested right to the continuance of existing traffic past their establishment. The requirement that defendants cross the highway only at designated places is imposed upon all members of the public.

Once upon the highway defendants are treated no differently than all other motorists.

In *Warren v. Iowa State Highway Commission*, 250 Iowa 473, 93 N.W.2d 60, 61 (1958), the Court again addressed the question. In that case, the Commission, while building a highway, had closed off plaintiff's secondary road. This caused her to travel over three additional miles to arrive at the point previously accessible by the secondary road. The Court found no taking and said:

> [O]ne whose right of access from his property to an abutting highway is cut off or substantially interfered with by the vacation or closing of the road has a special property which entitles him to damages. But if his access is not so terminated or obstructed, if he has the same access to the highway as he did before the closing, his damage is not special, but is of the same kind, although it may be greater in degree, as that of the general public, and he has lost no property right for which he is entitled to compensation.

> .     .     .     .     .

> . . . Many owners of motels, or gasoline stations, or other business establishments find themselves left in a bywater of commerce when the route of a highway is changed so that the main flow of traffic is diverted. A merchant or other business man is cut off from prospective customers going in one direction when a street in front of his establishment is converted into a one-way thoroughfare. *A divided highway, or one with jiggle bars or other obstructions in the center to prevent traffic crossing, has the same effect. But this gives the business man no claim for damages against the authority which has installed the traffic regulators which injure him.* Iowa State Highway Commission v. Smith, supra; Wilson v. Iowa State Highway Commission, 249 Iowa 994, 90 N.W.2d 161, 168.

*Id.* at 68 (emphasis added).

Finally, in *A and S, Inc. v. Iowa State Highway Commission* (Iowa 1962), the Supreme Court ruled on a factual situation virtually identical with the one before this Court. The Court there stated:

It is not the privilege, duty nor within the proper function of judges or courts to pass upon, approve or disapprove the location, design, plans or specifications of public highways. Jurisdiction and control over the primary highways are vested in and imposed on the state highway commission. Section 306.3, Code of Iowa, I.C.A. The improvement of primary roads under the jurisdiction of the commission is provided for in chapter 313, Code of Iowa, I.C.A. Chapter 306A, Code of Iowa, I.C.A., provides for controlled-access highways. In section 306A.1 the legislature finds, determines and declares the provisions of the chapter necessary for the immediate preservation of the public peace, health and safety, and for the promotion of the public welfare.

A controlled-access facility is a highway or street designed for through traffic and over, from or to which owners or occupants of abutting land or other persons have no right or easement or only a controlled right or easement of access by reason of the fact that their property abuts upon such controlled-access facility or for any other reason. Section 306A.2, Code of Iowa, I.C.A.

. . .      .      .      .      .

... The legislature has placed in the commission discretion, authority and power. Courts may interfere only when there is abuse of the power so granted or when there is attempted action beyond the grant of power.

Plaintiffs contend, and the trial court held, that the proposed action of the highway commission in not leaving breaks in the median strip opposite plaintiffs' property was arbitrary and unreasonable and therefore beyond the scope of proper and legal exercise of police power.

. . .      .      .      .      .

... While the authority of the highway commission is great, it may not proceed illegally nor in derogation of its statutory authority. *Batcheller v. Iowa State Highway Commission*, 251 Iowa 364, 101 N.W.2d 30. See also *Porter v. Iowa State Highway Commission*, 241 Iowa 1208, 44 N.W.2d 682. The general authority of the commission to design the pavement and provide for median strips and breaks therein is not questioned. We may interfere only if the refusal of the commission to provide breaks in front of plaintiffs' property is so arbitrary and unreasonable as to be beyond the police power of the state.

There is no all-embracing test of reasonableness. Human judgment is involved.

. . .      .      .      .      .

... The right of access to the highway at two points has been reserved to plaintiffs. Vehicles at plaintiffs' place of business may join the westbound traffic without inconvenience. We do have the question of the police power of the commission to restrict and regulate the manner and place at which vehicles may join eastbound traffic.

" * * * it is well settled that the regulation of highway traffic comes under the police power. Such regulations have included the prohibition of left and U-turns, the prescribing of one-way traffic and the separation of traffic lanes. Moreover, traffic controls, road design and highway relocation, giving rise to 'circuity of travel' and 'diversion of traffic,' have generally been held to constitute a valid exercise by the state of its police power." 43 Iowa Law Review 264, and citations.

■ The Court finds from the evidence presented and the above cited case law that it is within the police power of the Highway Commission to construct uncut medians in front of plaintiffs' place of business.

■ The Court further finds that plaintiff has failed to show that, in doing so, defendants acted arbitrarily or unreasonably. The evidence clearly supports defendants' proposition that such a median will

prove safer. Plaintiffs failed to show any motive on the part of defendants other than to provide for the safety and welfare of the people of Iowa whose interests defendants are statutorily required to consider and protect.

The Court also finds that balancing the interests of both parties, the scale tips decidedly in favor of defendants.

Plaintiffs seem to allege that they had a right to rely on the preliminary plan (which included a cut) and that they were not notified of any change. Plaintiffs have failed to show any intentional deception by defendants or any statement to the effect that the preliminary plan would not be changed. Additionally, there was no showing of a duty on the part of the Commission to keep plaintiffs advised of a change in plans. *A and S, Inc.*, 116 N.W.2d at 504. Even if such a duty existed, there was no violation by defendants. The evidence showed that the preliminary plan was changed to delete the median cut in March 1978. It was further shown that on April 17, 1978, William Ginn reviewed the final plans, which showed no median cut, in the offices of George Bighia. Additionally, an environmental impact statement, showing no cut, was made available to the public on May 2, 1978.

The Court therefore finds that any reliance by plaintiffs on the preliminary plan, while reasonable, did not guarantee that there would be no changes and the Iowa Department of Transportation, under the evidence presented here, was not unreasonable, arbitrary, or capricious in later altering the preliminary plan. Further, the Court finds that although notice of the median design change was delayed, plaintiffs did receive actual notice and plaintiffs failed to show that the delay prejudiced them in any manner.

IT IS THEREFORE ORDERED that the Clerk enter judgment in favor of defendants and against plaintiffs on plaintiffs' claim. The plaintiffs shall take nothing, the action shall be dismissed on the merits, and the defendants shall recover of the plaintiffs their cost of action.